**2016 UT App 241**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
COY BRANDON WHITE,
Appellant.

Opinion
No. 20141003-CA
Filed December 15, 2016

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 121908920

Nicole G. Farrell, Alan S. Mouritsen, and Adam E.
Weinacker, Attorneys for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and J. FREDERIC VOROS JR. concurred.

MORTENSEN, Judge:

¶1     Defendant Coy Brandon White was found uninvited and
without pants in a darkened bathroom by Victim, who engaged
in combat with his newfound adversary. A jury convicted
Defendant of aggravated burglary and aggravated assault, and
he now appeals. We affirm.

BACKGROUND

¶2     On the evening of May 11, 2012, Victim arrived home and
greeted his son (Son) before making his way to the master
bathroom to wash his hands. As Victim approached the
bathroom, he saw the silhouette of a man in his underwear.

Victim asked the man who he was and what he was doing, to which the man replied, "I'm here for your daughter." Victim's daughter was not home at the time. Using the bedroom door, which is adjacent to the bathroom, Victim attempted to trap the man in the bathroom. The man "stuck the end of a broom through an opening in the doorway" and hit Victim. Victim then opened the bedroom door, and the two men engaged in a physical struggle. At some point Son came in, and Victim instructed him to go get a knife. Son returned with two, giving one to Victim. Victim did not immediately use the knife against the man because he felt "compassion not to kill him." The man momentarily retreated to retrieve a clothes iron from the hall, which he used to strike Victim. When Victim countered with the knife, the man "started backing up defending himself with the iron," then dropped the iron and fled the apartment.

¶3    Police found blood on the iron and sent the blood to the Utah State Crime Lab for testing. The DNA from the blood matched a DNA sample in Utah's Combined DNA Index System. The sample belonged to Defendant. Neither Victim nor Son could identify Defendant at trial as the man in their home, and Victim failed to select Defendant's picture from a photo array following the incident. No one in Victim's family knew Defendant; he had never been invited to enter their home.

¶4    The State charged Defendant with aggravated burglary and aggravated assault, first and third degree felonies respectively. *See* Utah Code Ann. § 76-6-203 (LexisNexis 2012); *id.* § 76-5-103. During discovery, the State filed a motion under rule 16 of the Utah Rules of Criminal Procedure requesting a sample of Defendant's DNA via buccal swab—a method of collecting DNA by swabbing the interior surface of a person's cheek. The motion was supported by an affidavit from the investigating officer. Defendant objected to the motion. The trial court overruled Defendant's objection, and after hearing argument, granted the State's motion, ordering Defendant to provide the sample. Defendant refused. The State then filed a second motion, again under rule 16, requesting an order

allowing it to use force to obtain Defendant's DNA sample. Again Defendant objected, arguing that rule 16 does not authorize the use of force in obtaining a DNA sample, and again the trial court granted the State's motion. Defendant thereafter allowed investigators to take a sample of his DNA without force, and this was the only evidence the State presented at trial to prove Defendant's identity as the man in Victim's apartment.

¶5     Defendant's trial strategy involved alternative defenses. Either (1) Defendant was not the man who Victim found in his bathroom or (2) Defendant's actions were justified as a result of self-defense or compulsion. As Defendant explains, "Accordingly, the actions of [Victim] the night of the incident were relevant to [Defendant's] defense." For this reason, Defendant informed the trial court that Victim had entered a plea in abeyance on a 2010 assault charge and stated that if Victim put his own character at issue, Defendant would question him about the 2010 charge.

¶6     In the course of Victim's testimony, he stated that he had "felt compassion not to kill" the man in his bathroom and that he did not "have a criminal mind." Defense counsel, during a bench conference, asserted that these statements were "somewhat ambiguous, [and] may be a question of interpretation" and asked permission to cross-examine Victim on "what it is that he meant." In defense counsel's view, "depending on [Victim's] answer," that could "open the door to some discussion of the" plea in abeyance. The trial court refused the request.

¶7     Also during his testimony, Victim twice made comments indicating that he "felt more accused than the defendant."[1] After the first comment, Defendant requested, and the trial court gave,

---

1. Only one of these comments is explicitly indicated in the trial transcript. The parties' briefs and the context of the second comment indicate that Victim made an earlier comment along the same lines, which for some reason was not recorded.

a curative instruction to the jury to disregard the comment. Following the second comment, Defendant moved for a mistrial. The trial court denied the motion but indicated its willingness to give a second curative instruction; Defendant never requested this second instruction.

¶8 Finally, Defendant raised the issue of Victim's status as an undocumented immigrant. Victim had filed I-918 petitions—used to obtain what are commonly called U visas—for himself and his family. Defendant presented an expert at trial who explained that U visas confer legal status on victims of violent crimes. Defendant used this evidence to suggest a possible motive for Victim to fabricate the details of that night, namely, obtaining a more favorable immigration status. Defendant also sought to question Victim concerning his refusal to provide defense counsel with a copy of the I-918 petitions. The trial court had reviewed the petitions in camera and concluded that there was nothing potentially exculpatory in them. It therefore barred that line of questioning, explaining, "[T]hat is not coming in, that's not relevant for any purpose. . . . That's his right."

¶9 The jury convicted Defendant of aggravated burglary and aggravated assault. Defendant now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶10 Defendant first argues that the trial court erred in granting the State's rule 16 motions to obtain a sample of his DNA—particularly the second motion, which sought to obtain the sample by force—because the State should have been required to obtain a warrant. Normally, "rulings on motions to compel . . . are reviewed for an abuse of discretion." *Macris & Assocs., Inc. v. Neways, Inc.*, 2006 UT App 33, ¶ 8, 131 P.3d 263; *see also State v. Tanner*, 2011 UT App 39, ¶ 5, 248 P.3d 61. But because Defendant's argument rests on whether rule 16 is a proper mechanism for obtaining DNA evidence by force, resolution of this issue requires us to interpret the language of rule 16 and decide whether Defendant was afforded necessary

constitutional protections. We therefore review the trial court's grant of the State's motions for correctness. *See Ostler v. Buhler*, 1999 UT 99, ¶ 5, 989 P.2d 1073 ("The proper interpretation of a rule of procedure is a question of law, and we review the trial court's decision for correctness."); *State v. Holland*, 921 P.2d 430, 433 (Utah 1996) ("[T]he ultimate question of whether the trial court strictly complied with constitutional and procedural requirements . . . is a question of law that is reviewed for correctness.").

¶11 The second and third issues on appeal concern the trial court's restriction of Defendant's cross-examination of Victim, particularly regarding Victim's 2010 assault charge and his I-918 petitions. We generally review the trial court's decisions concerning the scope of cross-examination, including its decisions to allow or exclude evidence, for an abuse of discretion. *State v. Gomez*, 2002 UT 120, ¶ 12, 63 P.3d 72.

¶12 Defendant also argues that the trial court should have granted his motion for a mistrial following Victim's statements that he felt more accused than Defendant.

> Because a district judge is in an advantaged position to determine the impact of courtroom events on the total proceedings, once a district court has exercised its discretion and denied a motion for a mistrial, we will not reverse the court's decision unless it "is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial."

*State v. Allen*, 2005 UT 11, ¶ 39, 108 P.3d 730 (quoting *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948).

¶13 Notwithstanding the standards of review just outlined, we will reverse Defendant's convictions only if we are convinced that the trial court's errors made "the likelihood of a different outcome . . . sufficiently high to undermine confidence in the

verdict." *State v. Knight*, 734 P.2d 913, 920 (Utah 1987); *see State v. Draper-Roberts*, 2016 UT App 151, ¶ 16, 378 P.3d 1261 (dealing with harmlessness in an abuse-of-discretion context); *State v. Hawkins*, 2016 UT App 9, ¶ 33, 366 P.3d 884 (dealing with harmlessness in a correctness context); *see also* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."); *State v. Jimenez*, 2016 UT App 138, ¶ 9, 379 P.3d 50 (explaining that even if we determine certain evidence should have been admitted, we will reverse only if admission of that evidence would likely have led to a different result at trial). Thus, even if we determine or assume that the trial court erred in one of the ways Defendant identifies, we will reverse only if there is a reasonable likelihood that Defendant was harmed by the error or by the cumulative effect of several errors. When it is more expedient to do so, we focus our attention first on what harm, if any, Defendant suffered as a result of the alleged errors. *See State v. Cox*, 2012 UT App 234, ¶ 5, 286 P.3d 15 (indicating that we need not decide whether an "error was obvious or invited, or whether counsel was deficient in failing to object to it because we conclude that the error was harmless" (footnote omitted)); *cf. Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232 (explaining that under the ineffective-assistance-of-counsel standard, where it is easier to dispose of a claim on prejudice grounds, the court will do so without analyzing the reasonableness of counsel's performance).

¶14 Finally, Defendant contends that "the errors presented on appeal warrant reversal of [his] convictions under the cumulative error doctrine." "Under the cumulative error doctrine, we apply the standard of review applicable to each underlying claim or error" and "reverse only if the cumulative effect of multiple errors undermines our confidence that a fair trial was had." *State v. Davis*, 2013 UT App 228, ¶ 16, 311 P.3d 538 (citations and internal quotation marks omitted).

ANALYSIS

I. Authorization of Use of Force To Retrieve Defendant's DNA

¶15 Defendant contends that the State violated his constitutional protection against unreasonable searches and seizures, *see* Utah Const. art. I, § 14,[2] when it relied on rule 16 of the Utah Rules of Criminal Procedure to obtain authorization for the use of force in securing a sample of his DNA. We conclude that the trial court appropriately granted the State's rule 16 motion, authorizing the use of force in obtaining a sample of Defendant's DNA.[3]

¶16 *State v. Easthope*, 668 P.2d 528 (Utah 1983), addressed a nearly identical issue. There, the district court had ordered the defendant to surrender body and pubic hair, saliva, and blood samples under the predecessor to rule 16. *Id.* at 530, 531; *see also* Utah Code Ann. § 77-35-16 (Allen Smith Co. 1982). The defendant argued that "the taking of his blood sample without a search warrant was . . . unconstitutional." *Easthope*, 668 P.2d at 531–32 (footnote omitted). The Utah Supreme Court reasoned that "the purpose of the warrant requirement . . . was not to exalt the formality of the warrant but to assure that the decision to compel an invasion of a person's body in search of evidence of guilt was made by a neutral and detached magistrate." *Id.* at 532 (citation and internal quotation marks omitted). The court then

---

2. Defendant does not allege a violation of the Fourth Amendment to the United States Constitution.

3. We note that although the State ultimately did not need to resort to the use of force, *see supra* ¶ 4, Defendant's argument is that "Rule 16 does not permit the warrantless taking of DNA by force." Defendant is not precluded from pursuing this argument simply because he cooperated instead of risking injury by requiring the State to take his DNA by force.

set forth the following analysis, which applies directly to this case:

> That concern was fully satisfied in the circumstances of this case. Following defendant's arrest on a warrant, the State filed a motion to compel discovery of body fluids. Defendant and his counsel were notified, an adversary hearing was held, and . . . the magistrate ordered the taking of a blood sample. That course of events, which provided the defendant greater procedural protection than he has under a search warrant (notably his participation in the hearing), satisfied the constitutional requirements for the invasion of a person's body.

*Id.*

¶17 Not only does this analysis from *Easthope* support the conclusion that the trial court did not err in granting the State's motion in this case, but it also echoes the outcome of similar cases throughout the country. *See, e.g.*, *United States v. Pipito*, 861 F.2d 1006, 1009–10 (7th Cir. 1987) (comparing retrieving fingerprints to retrieving blood samples and concluding that force may be used to obtain such materials because "while it may not enhance the image of justice to force a witness kicking and screaming . . . the choice has been made by the witness, not the court" (omission in original) (citation and internal quotation marks omitted)); *Simmons v. Secretary, Dept. of Corr.*, No. 8:08-cv-2433-T-17EAJ, 2010 WL 1408434, at *12 (M.D. Fla. April 6, 2010) (deciding, where the Florida Rules of Criminal Procedure authorized a court to require the defendant to "'permit the taking of samples of the defendant's blood, hair, and other materials of the defendant's body that involves no unreasonable intrusion,'" that "the Court had the ability to require the Defendant to provide a saliva sample without needing a search warrant" (quoting Fla. R. Crim. P. 3.220)); *People v. Treece*, 511 N.E.2d 1361, 1367 (Ill. App. Ct. 1987) (concluding that Illinois

Supreme Court Rule 413 "can be used to obtain a blood sample from a defendant without resort to a search warrant following indictment or information").

¶18 Defendant's attempts to distinguish *Easthope* are unavailing. He claims that "the *Easthope* court did not analyze the precise language of Rule 16(h) or its interplay with the State's more recent constitutional jurisprudence and protection of individual rights." But as we explained, *see supra* ¶ 16, the statute relied on in *Easthope* was simply an earlier version of rule 16, and Defendant does not attempt to explain how the existence of two versions of the same rule, nearly identical in substance but different in name, affects the outcome on appeal. And the mere passage of time since it was decided, without more, does not make *Easthope* any less controlling.

¶19 As in *Easthope*, the trial court in this case used the then-current discovery rules to provide Defendant more protection than he would have received if the State had simply obtained a warrant for a sample of his DNA. *See infra* ¶ 24. In this we see no error.

¶20 Even without reference to the *Easthope* analysis, application of the relevant criminal discovery rules yields the same result. Rule 16 of the Utah Rules of Criminal Procedure provides that, "[s]ubject to constitutional limitations, the accused may be required to . . . permit the taking of samples of blood, hair, fingernail scrapings, and other bodily materials which can be obtained without unreasonable intrusion." Utah R. Crim. P. 16(h)(6). That same rule provides that if a party fails to comply, "the court may order such party to permit the discovery or inspection, . . . or it may enter such other order as it deems just under the circumstances." *Id.* R. 16(g). Here, the trial court required Defendant to provide "other bodily materials" when it ordered him to submit to a buccal swab. *See id.* R. 16(h)(6). Then, when Defendant failed to submit to such procedure, the trial court authorized the State to use force in obtaining the DNA sample.

¶21    Other courts have consistently described buccal swabs as minor intrusions. *See, e.g.*, *Maryland v. King*, 133 S. Ct. 1958, 1980 (2013) ("minor intrusion of a brief swab of his cheeks"); *Haskell v. Harris*, 669 F.3d 1049, 1050 (9th Cir. 2012) ("a *de minimis* intrusion"), *aff'd*, 745 F.3d 1269 (9th Cir. 2014) (en banc); *Friedman v. Boucher*, 580 F.3d 847, 863 (9th Cir. 2009) ("far less intrusive than drawing blood and a relatively minor intrusion"). And Defendant does not contend that the State's buccal swab procedure resulted in an "unreasonable intrusion." *See* Utah R. Crim. P. 16(h)(6). Instead, Defendant argues that the trial court's order failed to comport with "constitutional limitations" by authorizing the use of force. *See id.* He further claims that discovery rules cannot be used to circumvent the warrant requirement for searches. In Defendant's view, while rule 16 can be used to "require[ the accused] to permit the taking of . . . bodily materials that can be obtained without unreasonable intrusion," "the accused can decide to comply with the order, or refuse to comply and face the consequences." According to Defendant, those consequences cannot include "use of reasonable force."[4]

---

4. Defendant suggests that *State v. Bakalov*, 1999 UT 45, 979 P.2d 799, supports this argument. *Bakalov* involved a rape defendant who sought to have an expert evaluate a semen sample found on his victim. *Id.* ¶ 54. The trial court "granted the request subject to [the defendant's] first submitting a sample of his blood to the State." *Id.* ¶ 10. Because the defendant refused to provide the sample, the court denied his motion. *Id.* On appeal, our supreme court concluded that the trial court's imposed condition for testing "comported with Utah Rule of Criminal Procedure 16(h)(6)." *Id.* ¶ 54. Specifically, recognizing the significant discretion afforded trial courts "to remedy any prejudice to a party resulting from a breach of the criminal discovery rules," the supreme court determined that forcing the defendant to choose between providing a sample of his DNA or not having the semen sample evaluated did not "violate the constitution or

(continued…)

¶22    We cannot agree with Defendant's interpretation of the rule, which would effectively preclude the State from seeking information through discovery if that information could properly be the subject of a warrant. Instead, the rule grants the trial court considerable discretion to make discovery orders, so long as those orders comply with constitutional requirements. The constitutional requirement applicable to searches of a defendant's person and seizure of his or her DNA is one of reasonableness: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures shall not be violated . . . ." Utah Const. art. I, § 14.

¶23    The most common way the law ensures that a search and seizure is reasonable is to require a warrant, which "shall [not] issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized." *Id.* Probable cause "undoubtedly requires a nexus between suspected criminal activity and the place to be searched." *State v. Dable*, 2003 UT App 389, ¶ 5, 81 P.3d 783 (citation and internal quotation marks omitted). Probable cause is typically established by affidavit, as occurred here. In the present case, the suspected criminal activity was a man's unlawful entry into Victim's home and the ensuing altercation, which left blood on the clothes iron. The place to be searched was Defendant's person via a buccal swab for DNA. The strong nexus between the criminal activity and the place to be searched was the match between the DNA in the blood found on the iron

---

(…continued)

any other provision of law." *Id.* (citations and internal quotation marks omitted). But this holding from *Bakalov*—that a particular sanction was an appropriate response to that defendant's refusal to provide a DNA sample—cannot be interpreted to mean that no other condition or sanction would have been appropriate. In short, *Bakalov* has no application here except to underscore that a trial court has significant discretion in fashioning an appropriate sanction.

and Defendant's preexisting DNA sample in Utah's Combined DNA Index System. Probable cause existed for the retrieval of Defendant's DNA,[5] and we are confident that if the trial court had required the State to obtain a warrant—rather than granting the rule 16 motion—the State would have been readily able to do so. For this reason, we have no difficulty concluding that the trial court's order complied with the "constitutional limitations" imposed on rule 16 discovery orders. *See* Utah R. Crim. P. 16(h).

¶24    This is to say nothing of the fact that Defendant was likely afforded more protection than if the State had simply obtained a warrant, which is typically accomplished ex parte. Utah law requires the State, when seeking a search warrant, to demonstrate "probable cause, supported by oath or affirmation" and to "particularly describe the person or place to be searched and the person, property, or evidence to be seized." Utah R. Crim. P. 40(c)(2). Here, the State attached such an affidavit to its first rule 16 motion. Additionally, Defendant was given the opportunity to participate in two separate hearings regarding the State's rule 16 motions before he surrendered a sample of his DNA—something search-warrant subjects do not have the opportunity to do. *See State v. Easthope*, 668 P.2d 528, 531–32 (Utah 1983).

¶25    Finally, subsection (g) of rule 16 provides that where a party fails to comply with a discovery obligation, "the court may order such party to *permit the discovery or inspection*, grant a continuance, or prohibit the party from introducing evidence not disclosed, or *it may enter such other order as it deems just under the circumstances*." Utah R. Crim. P. 16(g) (emphases added). Thus, rather than limiting a trial court's discretion, the rule provides for a number of specific options for the trial court to consider, including any order that circumstances might justify. Accordingly, when Defendant refused the order for a buccal

5. On appeal, Defendant does not argue that probable cause did not exist.

swab, the trial court was well within its discretion in ordering the non-intrusive sampling by force, if necessary.

## II. Victim's Prior Assault Charge

¶26 We next consider whether the trial court abused its discretion when it limited Defendant's cross-examination of Victim about two specific statements. These statements, Defendant contends, "bolstered [Victim's] character for peacefulness." First, on direct examination, Victim explained that while he was fighting with the intruder, "I noticed that he was a young man. . . . And I felt compassion not to kill him, because I imagine my son, so I threw the knife to the ground." Then, he reiterated, "I repeat, I didn't want to cause any harm to him because I don't have a criminal mind." Defendant's counsel asked permission "to inquire into what it is he meant," and indicated that "depending on his answer, what that might be, it may, in fact, open the door to some discussion of" Victim's prior assault charge.[6] The trial court decided it would not allow such an inquiry, explaining, "I don't think that was sufficient opening up [of] any door to allow further follow up at this time." Defendant's arguments that this decision was erroneous are unpreserved.

¶27 Defendant first argues that he should have been allowed to question Victim as requested under rule 405 of the Utah Rules of Evidence, particularly under the rule's provision that "[o]n cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct." *See* Utah R. Evid. 405(a). This rule is intertwined with rule 404, which governs the admission of character evidence. Courts use rule 404 to determine when character evidence is admissible and rule 405 to determine how that evidence is to be admitted. *Compare id.* R. 404, *with id.* R. 405.

---

6. The statement of counsel is unambiguous in context. Counsel maintained that "the door" had not yet been opened.

¶28　But Defendant never raised below—and thus did not preserve for appeal—any argument regarding rule 404 or 405 admissibility. To have preserved his challenge for our review, Defendant must have "provide[d] the trial court with the opportunity to address, and correct, a claimed error" by "specifically" raising it. *See State v. Crabb*, 2011 UT App 440, ¶ 2, 268 P.3d 193 (per curiam).

> Issues that are not raised at trial are usually deemed waived. An issue is preserved for appeal only if it was presented to the trial court in such a way that the trial court had an opportunity to rule on it. The appellant must present the legal basis for a claim to the trial court, not merely the underlying facts or a tangentially related claim.

*State v. Martinez*, 2015 UT App 193, ¶ 27, 357 P.3d 27 (alterations, citations, and internal quotation marks omitted).

¶29　A review of the transcript in this matter shows that rules 404 and 405 of the Utah Rules of Evidence were not the bases of any objection or ruling. As quoted above, the only request was to question the witness to see if further questioning "may, in fact, open the door." This is a different question entirely and is governed by rule 611(b) of the Utah Rules of Evidence (which addresses the scope of cross-examination), not rules 404 or 405. Further, Defendant does not argue on appeal that further questioning might have opened the door. Thus, Defendant both does not appeal the actual ruling of the trial court and did not provide the trial court with the opportunity to make any rulings under rules 404 or 405. Therefore, this argument was not preserved, and we decline to address it further.

¶30　Defendant next argues that Victim's assault charge was admissible under rule 608 of the Utah Rules of Evidence, which allows introduction of evidence about a witness's character for untruthfulness. *See* Utah R. Evid. 608. Defendant maintains that when Victim claimed on the witness stand to be compassionate

and to lack a criminal mind, the assault charge became evidence of Victim's character for untruthfulness because it showed that this testimony was not true. Furthermore, Defendant argues that such evidence did not run afoul of rule 404(b), citing the Utah Supreme Court's decision in *State v. Houskeeper*, 2002 UT 118, 62 P.3d 444.

¶31    We decline to review this issue because it, too, is unpreserved. Defendant never informed the trial court that the assault charge could potentially be used to demonstrate a lack of credibility on the part of Victim, except in the limited context of Victim's I-918 petition. *See infra* ¶¶ 32–40. Thus, as it relates to Victim's statements of his compassion and lack of a criminal mind, the assault charge, and its bearing on rule 608, was not "sufficiently raised to a level of consciousness before the trial court," and we will not consider it. *See State v. Richins*, 2004 UT App 36, ¶ 8, 86 P.3d 759 (citation and internal quotation marks omitted).[7]

### III. Victim's I-918 Petitions

¶32    Defendant next challenges his inability to cross-examine Victim about Victim's refusal to disclose a copy of his I-918 petitions. We conclude that the requested cross-examination was irrelevant. In any event, Defendant was not harmed by the trial court's refusal to allow the questioning. I-918 petitions help "provide temporary immigration benefits to aliens who are victims of qualifying criminal activity, and to their qualifying family members, as appropriate." I-918, Petition for U Nonimmigrant Status, U.S. Citizenship and Immigration Services, https://www.uscis.gov/i-918 [https://perma.cc/LJ99-VBTA]. As Defendant explains, "one of defense counsel's trial strategies was to suggest that [Victim] had a motive for being

---

7. Defendant does not ask us to consider either his rule 405 challenge or his rule 608 challenge under the plain error doctrine.

deceptive about the details of the May 11, 2012 incident," namely, "to gain legal status in the United States." To help develop this trial strategy, Defendant sought to cross-examine Victim concerning whether he "had been given the opportunity to release his I-918 documents to the defense and had declined to do so." The trial court refused to allow this questioning, determining that it was "not relevant for any purpose," because it was Victim's right not to provide those documents to the defense. The trial court instead allowed Defendant to have an expert witness provide "general information as to how this process works" and to elicit from Victim "the simple fact" that he and members of his family had filed I-918 petitions.

¶33 On appeal, Defendant asserts that the trial court's ruling exceeded its discretion, as Victim's "decision not to disclose the contents of his I-918 documents was unquestionably relevant" and the "jury could reasonably have inferred from [Victim's] decision not to disclose the I-918 documents that they contained allegations inconsistent with what [Victim] told investigators, and which might be inconsistent with his preliminary hearing and trial testimony." We disagree with Defendant and conclude that the trial court did not abuse its discretion in ruling that the requested cross-examination was irrelevant.

¶34 "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Utah R. Evid. 401. Defendant argues that Victim's failure to disclose the I-918 petitions to the defense makes it more probable that Victim fabricated his account of the events in question.

¶35 First, Defendant has not shown—or even attempted to show—that he was entitled to receive those documents. And as the State points out, "there are a number of legitimate reasons why [Victim] would not want to give his immigration forms directly to the defense." Consider, for example, the fact that Victim found Defendant—a stranger—in the bathroom of his home, without pants on. This discovery was made shortly before Defendant declared that he was there for Victim's daughter. And

this declaration was made shortly before Defendant engaged in a physical altercation with Victim. Under these circumstances, Victim's decision to withhold the sort of personal information contained in the I-918 petitions, including information about his daughter, from the defense seems wholly reasonable.

¶36    In any event, the inference that Defendant argues the jury would have made constitutes speculation, especially considering the trial court's in camera review of the documents. *See supra* ¶ 8. Defendant has not challenged the trial court's in camera finding that the petitions contained no exculpatory information, nor does Defendant argue that the trial court erred in failing to order production or disclosure of the application documents.

¶37    It follows that cross-examination about Victim's refusal to provide copies of the petitions directly to the defense had no tendency to make it more probable that Victim had fabricated his story. Thus, the trial court did not abuse its discretion when it concluded that the requested line of questioning was "not relevant for any purpose."

¶38    But even if we agreed with Defendant that the trial court should have allowed the cross-examination, we see no reasonable likelihood that the cross-examination would have changed the outcome of the trial.

¶39    Defendant's assumption about what the jury would have inferred is not based in fact. There is no evidence on the record that the petition contained falsehoods. The trial court even performed its own in camera review of these documents and did not "find anything potentially exculpatory in the information provided." Most importantly here, Defendant actually presented the evidence necessary to develop his stated trial strategy: his expert witness testified regarding the process and purpose of obtaining a U visa and Defendant asked Victim whether he had filed I-918 petitions. Then, in his closing argument, defense counsel argued that Victim had "a reason to make this look as bad as it can be" to take advantage of the U visa process.

¶40　Because Defendant cannot show that there was anything suspicious in Victim's I-918 petitions, he cannot show that further questioning Victim on the subject would have led to any evidence different from the evidence that was actually presented. Defendant was not harmed by an inability to present what would have, at best, constituted cumulative evidence. In other words, even if the trial court erred by concluding that Defendant's potential questions were irrelevant, that error was harmless.

## IV. Victim's Statements That He Felt Accused

¶41　Defendant next argues that the trial court should have granted his motion for a mistrial. During the course of his testimony, Victim indicated, without being asked, that he felt more accused than Defendant. *See supra* ¶ 7 & note 1. Defense counsel objected. The trial court instructed that the comment "will be stricken from the record and the jury is to disregard the last comment," and it admonished Victim, "I'm going to ask you not to have any further comments that are not in response to a direct question." Then, mistakenly believing that he was being asked what he had said before—the comment he made that had been stricken—Victim explained, "I said that I felt more accused than the defendant." The prosecutor, defense attorney, and the trial court all interjected and agreed that there "was a misunderstanding with regard to [the] question." Defense counsel then clarified, "I'm not talking about the comment you may have made. What I'm talking about is . . ." and continued his questioning.

¶42　After Victim was excused from the witness stand, and after the jurors were sent home for the day, Defendant moved for a mistrial "based on that comment." The court denied the motion but said, "To the extent you think a curative instruction is needed in writing to go to the final set, I'd be happy to look at that and we can discuss that further." Defendant never asked for such a curative instruction, and no further reference was made to Victim's comments.

¶43    Our supreme court has explained "that a mistrial is not required where an improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *State v. Allen*, 2005 UT 11, ¶ 40, 108 P.3d 730. Defendant acknowledges that the statements were not intentionally elicited. And we consider the two statements—one not captured on the record and one clarifying what was not captured on the record, unfortunately causing it to be repeated in the process—to have been made in passing. But perhaps most importantly, even if we assume that there was some error in how the trial court handled the statements, Defendant cannot show that he was harmed by the error; he cannot show that Victim's statements were not "relatively innocuous in light of all the testimony presented." *See id.*

¶44    As the State points out, "given the strength of the State's case, it is unlikely that [Victim's] comment influenced the verdict." Victim was one of nearly a dozen witnesses who testified at trial over a period of three days. The two statements—or references to them—appear on just two of more than 800 transcript pages. There was no dispute that Victim and his family did not personally know Defendant, nor did they ever invite him into their home. Yet Defendant's DNA was found on the clothes iron the intruder used in his altercation with Victim. Simply put, our confidence in the jury's verdict has not been undermined. *See State v. Knight*, 734 P.2d 913, 920 (Utah 1987). Instead, the record reflects that the comments were not intentionally elicited, were made in passing, and were relatively innocuous in light of all the other testimony presented.[8]

---

8. Defendant argues that the statements were harmful because they "sought to negate [Defendant's] claim of self-defense." Specifically, he contends that "defense counsel's effort to demonstrate that the primary alleged victim may have actually been the aggressor[] was undermined by that individual's statements that he was feeling as if he were an accused."

(continued…)

V. Cumulative Error

¶45    Finally, we consider Defendant's argument that his convictions "must be reversed under the cumulative error doctrine." "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted). Defendant claims that the errors he alleges undermine confidence in his convictions because they prevented him from effectively presenting his affirmative defenses.

¶46    "In assessing a claim of cumulative error, we consider all the identified errors, as well as any errors we assume may have occurred." *Id.* For purposes of our earlier analysis, we decided certain issues, in part, by assuming that error had occurred. *See supra* ¶¶ 38–40, 43–44. Thus, our cumulative error analysis requires that we consider those assumed errors, along with their harmful effect. *See Dunn*, 850 P.2d at 1229.

¶47    In so doing, we conclude that the cumulative effect of any assumed errors has not diminished our confidence in Defendant's convictions. None of the evidence that Defendant either sought to admit or exclude would have undermined Victim's testimony that Defendant was not invited into his home. Similarly, it would have done nothing to prevent the jury's finding that he entered Victim's home with the intent necessary to be convicted of burglary.[9] *See* Utah Code Ann.

---

(…continued)
Defendant draws this conclusion without explaining how that statement actually undermined his self-defense theory, which was problematic at best given the circumstances.

9. On appeal, Defendant does not challenge the jury's finding of intent.

§§ 76-6-202, 76-6-203 (LexisNexis 2012) (outlining the elements of burglary and aggravated burglary). From there, the case against Defendant solidifies. As defense counsel acknowledged in his closing argument, "[I]f the man by the time he is discovered in the bathroom, has escalated [to] burglary, then game over. . . . [Y]ou don't get to defend yourself when you . . . are committing burglary." *See State v. Standiford*, 769 P.2d 254, 265 (Utah 1988) (analyzing without disapproving a self-defense jury instruction that "stated that the defense was not available if defendant was committing or fleeing from the commission of a burglary"); *see also Pitts v. State*, 989 So. 2d 27, 31 n.3 (Fla. Dist. Ct. App. 2008) ("[I]f a defendant enters a conveyance or dwelling to commit an offense other than battery, but then commits a battery when confronted . . . [t]he defendant would not be entitled to assert self-defense on the battery because the battery occurred when the defendant was involved in the commission of a burglary . . . ."); *State v. Evans*, 755 S.W.2d 673, 674 (Mo. Ct. App. 1988) (rejecting a challenge on appeal where "Defendant would have us believe a criminal caught in the commission of a burglary has the right to resist apprehension by the victim and has the right to use a weapon in this resistance"). *Compare* Utah Code Ann. § 76-2-402 (LexisNexis 2012) ("A person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person or a third person against another person's imminent use of *unlawful* force." (emphasis added)), *with id.* § 76-2-405 ("A person is justified in using force against another when and to the extent that he reasonably believes that the force is necessary to prevent or terminate the other's unlawful entry into or attack upon his habitation . . . .").

¶48 None of the assumed errors, if corrected, would have led the jury to believe that Defendant was not in Victim's home. Similarly, no correction of the assumed errors would have convinced the jury that he was there lawfully. Thus, we cannot conclude that the cumulative effect of these assumed errors undermines our confidence in Defendant's convictions.

CONCLUSION

¶49   The arguments Defendant makes on appeal are either unpreserved or unpersuasive, or the errors assumed did not result in harm to Defendant. We therefore affirm his convictions.

---